

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 8, 2025

**By ECF**
The Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   *United States v. Joshua Gutierrez*, 25 Cr. 249 (DLC)

Dear Judge Cote,

The Government respectfully submits this letter in advance of the December 11, 2025 sentencing of Joshua Gutierrez. For the reasons set forth below, a Guidelines sentence of at least 41 months' imprisonment is necessary and appropriate in this case.

1. **The Offense Conduct**

    A. **The Check Scheme**

This case involves a nationwide scheme to sell and fraudulently deposit stolen checks at various financial institutions. Before such checks were deposited, they were "washed," which is a process by which the payee's information on the check is replaced with that of an account controlled by individuals participating in the scheme. Often, the amount on the check would be revised as well to maximize the amount to be stolen.

Joshua Gutierrez worked for Micheal Pena, the leader of the scheme, who operated and used a channel on a particular messaging platform, which went by the moniker "White House Vibez," to sell checks that had been stolen from the United States Postal Service. (PSR ¶ 9.) From approximately April 2023 to October 2024, thousands of stolen checks worth more than $53 million were posted for sale on White House Vibez and the channel, itself, had thousands of subscribers. (*Id.*) The checks appeared to belong to individuals located in several states, including New York, New Jersey, Pennsylvania, Maryland, Florida, and Texas. (PSR ¶ 12.) On occasion, personal identifying information of the payors was also offered for sale, which may have been used to identify the amount of funds available in a payor's bank account and therefore, the maximum that could be stolen from the payor. (*Id.*)

On White House Vibez, purchasers of checks were directed to send payment to various accounts on a mobile payment platform. (PSR ¶ 13.) Typically, Pena would utilize a particular account until it was shut down by the payment platform. The participants in the scheme would

then open a new account and notify the subscribers of White House Vibez. (*Id.*) This happened repeatedly. In total, these accounts received more than $750,000 during the scheme.

Pena also bragged to subscribers about his own success depositing fraudulently altered checks at various financial institutions. (PSR ¶ 14.) Pena would often post receipts of such deposits and of cash withdrawals on White House Vibez, in an apparent attempt, at least in part, to attract customers and convey the ease with which they could make money as part of the scheme. (*Id.*) These transactions were carried out by each of the defendants.

Each of the defendants played a particular role in executing the scheme:

- Pena was the leader of the scheme and ultimate beneficiary of much of the proceeds of the bank fraud conspiracy. Pena sourced the stolen checks and operated White House Vibez. (PSR ¶ 42.)

- Gutierrez, Harrington Delahoz, and Jaysen Dorsey were hired by Pena to deposit stolen, altered checks, the results of which were often posted on White House Vibez. (PSR ¶ 43.)

- Gutierrez and Delahoz also opened payment platform accounts that were utilized to collect and transfer proceeds from the scheme. Such accounts were among those posted on White House Vibez and where customers would send payments for purchased checks. (PSR ¶ 44.)

### B. Gutierrez's Role in the Scheme

Over the course of the scheme, Gutierrez, Delahoz, and Dorsey deposited more than $210,000 of stolen, fraudulently altered checks at various financial institutions. (PSR ¶¶ 25, 27, 29.) Gutierrez, in particular, deposited at least twenty-six checks totaling more than $72,000. The defendants typically traveled to banks as a group. Upon arriving at a bank, one of the defendants would enter the bank, deposit a check, and then leave the bank just minutes later. At approximately the same time, receipts of such deposits would be posted to White House Vibez or Pena's personal account on the messaging platform. (PSR ¶ 31.) For his work, Gutierrez was paid approximately $100 per check.

Additionally, Gutierrez opened at least one payment platform account that was posted on White House Vibez. (PSR ¶ 22.) At the time of account opening, Gutierrez provided as proof of identity a photograph of a purported driver's license and a real-time photograph of himself. (*Id.*) The license was issued by the state of Florida, but while it contained Gutierrez's picture, the personal identifying information, including the name, date of birth, and address listed, was of another individual. (*Id.*) The license was fake. Gutierrez's payment platform account received more than $44,000 during the time that it was posted on White House Vibez. (*Id.*)

### 2. The Plea, Guidelines Calculation, and Relative Culpability

On September 10, 2025, pursuant to a plea agreement, Gutierrez pled guilty to Count One of the Indictment, which charges him with bank fraud conspiracy, in violation of 18 U.S.C. § 1349. In Gutierrez's plea agreement, the parties stipulated to a Guidelines range of 41 to 51 months'

imprisonment based on an offense level of 20 and a criminal history category of III. The Probation Office reaches the same Guidelines calculation. (PSR ¶ 111.)

All three of Gutierrez's codefendants have also pled guilty. In the Government's view, Pena is by far the most culpable of the four convicted defendants, followed by Gutierrez and Delahoz, and finally Dorsey. The below table summarizes the counts of conviction, stipulated Guidelines calculations, and (where applicable) the sentences imposed for the defendants.

| Defendant | Count of Conviction | Offense Level | Criminal History Category | Guidelines Range | Sentence Imposed |
|---|---|---|---|---|---|
| Pena | 1 | 32 | I | 121–151 Mos. | |
| Gutierrez | 1 | 20 | III | 41–51 Mos. | |
| Delahoz | 1 | 20 | III | 41–51 Mos. | |
| Dorsey | 1 | 16 | IV | 33–41 Mos. | |

### 3. Applicable Law

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

The statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, pursuant to which the sentence needs:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

While a court may not presume that an appropriate sentence lies within the Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that . . . courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

### 4. The Court Should Impose a Sentence of at Least 41 Months' Imprisonment

A Guidelines sentence—*i.e.*, of at least 41 months' imprisonment—is warranted in this case given Gutierrez's role in the scheme and his criminal history. The Government also requests that the Court impose a term of supervised release of at least three years. Probation similarly recommends a custodial sentence of 41 months to be followed by three years of supervised release.

First, Gutierrez was an active participant in the scheme. He was entrusted by Pena with depositing a significant amount of stolen, fraudulently altered checks. Gutierrez, without regard for the individuals whose money he was stealing, brazenly deposited check after check after check; over two dozen in total. Moreover, this figure only represents what the Government has uncovered to date. This conduct, by itself, is worthy of a considerable sentence.

However, Gutierrez played an additional key role in the scheme. He opened one of the accounts used to collect proceeds from customers of the defendants' stolen check business. Opening these accounts was critical to monetizing this illegal business. Moreover, in doing so, Gutierrez clearly demonstrated that he knew his conduct was wrong. He used false identification to open this account, hiding his true identity and instead associating the account with an innocent third-party whose personal identifying information was printed on the fake driver's license.

A significant sentence is also necessary to afford adequate deterrence to the defendant and to protect the public from further crimes of the defendant. Gutierrez has two prior convictions for similar conduct (*i.e.*, possession of a forged instrument), in those cases involving counterfeit currency. (PSR ¶¶ 67-68.) In fact, Gutierrez committed the instant offense while on parole for the most recent of these convictions. In connection with his second conviction for possession of a forged instrument, Gutierrez was sentenced two forty-two months to seven years' imprisonment. Yet, despite this significant sentence, he almost immediately returned to fraud upon his release on parole in March 2023. Gutierrez cannot continue down this path and a substantial sentence is warranted to disrupt this pattern and send a clear message that financial fraud will not be tolerated as a solution to his problems.

The Government commends the defendant on his seemingly positive trajectory during his pretrial release in this case and it is regrettable that his actions have impacted his family, including his baby daughter. However, the consequences of the defendant's actions, though unfortunately

borne in part by his loved ones, are the responsibility of the defendant and not unique to him among criminal defendants.

5. **Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence of at least 41 months' imprisonment.[1]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____
Varun A. Gumaste
Assistant United States Attorney
(212) 637-1023

cc: Martin Cohen, Esq. (by ECF)

---

[1] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).